## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

PIERRE GARÇON,
*Individually and on behalf*
*of all those similarly situated.*

        Plaintiff,

v.                                   Civil Action No.

FANDUEL INC.
19 UNION SQUARE WEST, 9TH FL.
NEW YORK, NY 10003

        Defendant.

## COMPLAINT

Plaintiff Pierre Garçon, through his attorneys, brings this Class Action against Defendant FanDuel Inc. ("FanDuel") for himself and for all others similarly situated, alleging as follows:

## NATURE OF ACTION

1.      In the operation and sale of online daily fantasy football gaming products, Defendant FanDuel knowingly and improperly exploits the popularity and accomplishments of current Washington Redskins wide receiver Pierre Garçon, along with all the other National Football League ("NFL") players at offensive skilled positions. In addition, through a comprehensive advertising campaign and in its daily fantasy football contests, Defendant FanDuel routinely uses the names and likenesses of these NFL players to promote FanDuel's commercial enterprise, collecting huge revenues from entry fees, without the authority of Mr. Garçon or the other NFL players. Plaintiff and the proposed Class members have not given their consent to Defendant's blatant misappropriation of their publicity rights. Nevertheless, Defendant FanDuel continues to

promote and to operate its daily fantasy football contests on the backs of NFL players, whose popularity and performance make the Defendant's commercial daily fantasy football product possible.

## PARTIES, JURISDICTION, AND VENUE

2.      Plaintiff Pierre Garçon is an individual residing in Ashburn, Virginia who plays professional football in the NFL for the Washington Redskins and is one of the top wide receivers in the league who regularly shows his talents at FedEx Field in Landover, Maryland.

3.      He has worked tirelessly to achieve his success after having been drafted 205th in the 2008 NFL draft out of Mount Union College.

4.      That hard work has paid off on the field, so much so that in 2013, Plaintiff Garçon was the NFL reception leader.

5.      This case is about FanDuel trying to profit on Plaintiff Garçon's success, and that of other NFL athletes, without compensating them.

6.      Defendant FanDuel Inc. is a Delaware corporation, based in New York City, New York, that has created what is essentially its own series of interactive online simulation games, trying to capitalize on the successes, the names, the images, and the likenesses of Plaintiff Garçon and other players both in the games and to promote the games.

7.      This Court has diversity jurisdiction over this action under 28 U.S.C. § 1332 because the amount in controversy for Mr. Garçon exceeds $75,000 and for the class exceeds $5,000,000.

8.      Plaintiff and one or more Class member(s) is a citizen of a state different from the Defendant.

9.      The Court also has jurisdiction under 28 U.S.C. § 1331.

10.     This Court has personal jurisdiction over Defendant because Defendant FanDuel conducts substantial business in the district, even operating a "FanDuel lounge" at FedEx Field in Landover, Maryland.

11.     Venue is proper in this district under 28 U.S.C. § 1391 because Defendant transacts substantial business in this district and performs acts here that form the basis for the Plaintiff's and Class members' claims in this Complaint.

## FACTS

### I.      FanDuel's Sales of Its Online Games Using NFL Players' Rights Generates Hundreds of Millions of Dollars in Revenue.

12.     The daily fantasy sports commercial market is a billion-dollar industry and, in FanDuel's case, is dependent on professional athletes' names, likenesses, talent, performance, and popularity.

13.     FanDuel has upended the daily fantasy sports world by creating its own private fee to play online gaming product for daily fantasy sports contests.

14.     Defendant FanDuel runs online interactive games where a purchaser from FanDuel pays FanDuel an entry fee and in exchange is given virtual FanDuel currency to use during this online game to purchase individual players to build a virtual team of professional athletes.

15.     FanDuel markets on their website that their online competition is thrilling:



16.     In this case, the players' rights of personality at issue being sold by FanDuel are those of the NFL players, and the FanDuel customers use those purchases to compete against other users in their online games based on their virtual team members' real world performance.

17.     In effect, each participant becomes the owner and general manager of a daily fantasy football franchise within the FanDuel game.

18.     FanDuel users set up and access FanDuel and their FanDuel account through an Internet browser or through FanDuel's mobile platforms.

19.     After a user has activated his account and paid to enter an NFL FanDuel contest, he can fill out his roster by purchasing current NFL identified players by their name, position, and FanDuel-assigned salary cap amount.

20.     In Defendant FanDuel's NFL daily fantasy football games, the participant is not committed to his team for an entire NFL season, like in other fantasy leagues.

21.     Rather, FanDuel users can purchase NFL players for their daily fantasy teams under a designated salary cap for one week only.  Defendant FanDuel assigns each NFL player a dollar amount, which counts against that salary cap, based on that player's performance and popularity.

22.     In daily fantasy football, the most popular NFL players are marketed the most by FanDuel and often drafted first.  Their dependable play on the field makes them

a dependable source of fantasy points, which are necessary to win any daily fantasy football online game.  Should a player underperform or get hurt, FanDuel's customers can adjust their rosters throughout the NFL season through trades with other game players, waiver acquisitions, or free agency.

23.     Defendant FanDuel releases the final lineups cards in each game selected by each customer after NFL games have started each Sunday, incorporating even the pictures of the NFL players in those online lineup cards:

# Your lineup

🔒 Lineup locks @ this Sunday 1pm

**$300** Salary Remaining | **$0** Avg/Player

| | | |
|---|---|---|
| QB Andy Dalton 💬 <br> ATL@**CIN** | $7,800 | ⊖ |
| RB LeSean McCoy 💬 <br> **PHI**@IND | $9,200 | ⊖ |
| RB Marshawn Lynch 💬 <br> **SEA**@SD | $9,000 | ⊖ |
| WR Marques Colston 💬 <br> **NO**@CLE | $5,600 | ⊖ |
| WR Pierre Garcon 💬 <br> JAC@**WAS** | $6,900 | ⊖ |
| WR Kendall Wright 💬 <br> DAL@**TEN** | $6,100 | ⊖ |
| TE Delanie Walker 💬 <br> DAL@**TEN** | $5,000 | ⊖ |
| K Mike Nugent 💬 <br> ATL@**CIN** | $5,200 | ⊖ |
| D Tampa Bay Buccaneers <br> STL@**TB** | $4,900 | ⊖ |

24.     With Defendant FanDuel's daily fantasy format, the FanDuel game players can draft a different fantasy football team each week and choose a different game format each week, with a variety of options created by FanDuel.

**II.     FanDuel Exploits Current NFL Players' Popularity To Drive Users to Their Daily Fantasy Sports Gaming Products.**

25.     Defendant FanDuel's success in selling the game depends on driving users to their web platform for daily fantasy football games and getting them to purchase and play a new online fantasy football game each week.

26.     Capitalizing directly on NFL players' popularity and performance, Defendant FanDuel promotes and operates its daily fantasy sports contests using NFL players' names and likenesses.

27.     Defendant FanDuel attracts users to their contests through a comprehensive advertising campaign designed to solicit the largest number of users, and with them huge revenues for Defendant FanDuel in entry fees.

28.     Defendant FanDuel broadly advertises its daily fantasy sports website and contests on television and online, including broadcast and cable networks, YouTube, Fanduel.com, Fanduel.com/insider, Instagram, and Facebook.

29.     Defendant FanDuel frequently runs national television advertising campaigns, using NFL players' names to promote its daily fantasy sports contests.

30.     Those campaigns run commercials on virtually all of the major television networks, including but not limited to, ESPN Networks, NBC Sports, CBS Sports, CNN, Spike TV, Univision, NBC, and CBS.

31.     As part of those campaigns, FanDuel intentionally capitalizes in their advertisements by repeatedly using the names of only the most well known NFL stars to

promote the FanDuel game and drive traffic to their website to sell their online games. Of course, there is no reason to use the names of the NFL stars in the advertisements other than to promote sales of FanDuel's online games.

32.     Beginning in September 2015, FanDuel began running a national advertising campaign on the major television networks that included a twenty-eight minute infomercial advertising FanDuel's online games to consumers.

33.     That infomercial begins with the acknowledgement, "The following is a paid advertisement for FanDuel."

34.     As set forth in the picture below, that "paid advertisement" by FanDuel consistently through that entire infomercial misappropriates Pierre Garçon's and other players' names over and over again, with the sole purpose of selling FanDuel—but without compensating Mr. Garçon or, upon information and belief, the other players:



35.     Indeed, throughout the game, Mr. Garçon and other players' names are used to promote all the advantages of FanDuel, including FanDuel's marketing claim of "MOST PAYOUTS":



36.     For large portions of the infomercial, the paid actor in the commercial stands next to a television screen that has Pierre Garçon's name scrolling atop the television screen with eight other of the most famous NFL Stars, including Andrew Luck, Aaron Rogers, Antonio Brown, Le'Veon Bell, Jamaal Charles, Greg Jennings, and Marshawn Lynch.



37.     All told, Defendant wrongfully uses Pierre Garçon's name alone over *fifty-three times in the infomercial that lasts only 28 minutes and thirty seconds.*

38.     Upon information and belief, as of October 25, 2015, that infomercial continued to be run on numerous national networks and was reported to be running on CNBC on that date.

39.     Likewise, upon information and belief, FanDuel has on thousands of other occasions aired a television commercial—"Get off the Sidelines"—on the national networks.

40.     For example, upon information and belief, FanDuel has run "Get off the Sidelines" at least 3,125 times; upon information and belief, it specifically ran on CBS Sports on October 29, 2015.

41.     As with the FanDuel infomercial, the "Get off the Sidelines" television advertisement touts FanDuel's website and game by misappropriating Plaintiff Garçon's name.

42.     As depicted below, fourteen seconds into that commercial, Defendant FanDuel displayed Plaintiff Garçon's name, position, and team abbreviation (WAS) as an NFL player that potential FanDuel users could select for their FanDuel daily fantasy team and the actor then selects Plaintiff Garçon's name:



43.     Upon information and belief, likewise, on or about October 5, 2015, FanDuel ran another national television advertising campaign for its website with a

commercial known as "People Go Crazy," in which it displayed Plaintiff Garçon's name, position, and team abbreviation (WAS) as an NFL player that potential FanDuel users should select for their FanDuel daily fantasy team as follows:



44.     Upon information and belief, FanDuel has run the "People Go Crazy" advertisement over 712 times and has several versions of this ad.

45.      Upon information and belief, therefore, FanDuel has reached millions of households and attracted thousands of new customers and millions of dollars in purchases of its game by misappropriating Pierre Garçon's and other similarly situated NFL players' names in its marketing.

46.     Indeed, upon information and belief, during the first full week of October 2015 alone, Defendant FanDuel spent over $16 million in television advertising, airing its commercials nationwide over 2,900 times.[1]

---

[1] iSpot.tv, Top Ten Spenders in TV Advertising This Week, http://www.ispot.tv/free-reports/top-spenders-tv-ads (last accessed Oct. 12, 2015).

47.     Defendant FanDuel also publishes the same advertisements on the Internet, including YouTube.

48.     All of this improper advertisement is intended to and does drive customers to the host of Defendant FanDuel's online games, its websites, Fanduel.com, and Fanduel.com/insider, which then becomes the focal point of marketing to the customers.

49.     There, Defendant FanDuel continues to exploit NFL players' names and likenesses to promote its daily fantasy sports contests and to solicit users.

50.     Similarly, on its FanDuel website, Defendant FanDuel prominently posts the Class members' names and photographs and solicits potential users to purchase them for their FanDuel daily fantasy game football roster.  For example, for Le'Veon Bell, Plaintiff, and others, FanDuel uses the following in its game:



51.     To induce people to buy into the games, FanDuel also promotes the success customers will have if they follow FanDuel's recommendations, again using players' names and likenesses in the marketing, without permission.  For example, once at the website FanDuel continues to use Pierre Garçon's and nine other players' names and likenesses in that marketing:



TARGET RELIABLE WRS



# TARGETS
## CAN PREDICT FANTASY
# SUCCESS

| Player | Pos | Team | Targets | AVG |
|--------|-----|------|---------|-----|
| Pierre Garcon | WR | WAS | 182 | 11.4 |
| Andre Johnson | WR | HOU | 181 | 11.3 |
| A.J. Green | WR | CIN | 178 | 11.1 |

Most targeted players 2013

Read more

LOCK DOWN YOUR MATCHUPS

**III.** **By Blatantly Misappropriating These Valuable Publicity Rights, FanDuel Has Injured—And Continues to Injure—Plaintiff Garçon and the Class Members.**

52.    Professional athletes' names and likenesses are valuable intangible property.

53.    Indeed, Plaintiff's and Class members' continued popularity and successful performance on the field are critical to their own commercial success and the commercial success of the NFL.

54.    Plaintiff, and upon information the other NFL players, have not consented, in writing or otherwise, to Defendant FanDuel's use of their names or likenesses to promote or to operate its daily fantasy sports product.

55.     FanDuel's regular use of Plaintiff's name in its television and Internet advertising is likely to create confusion among potential users as to Plaintiff's sponsorship or approval of FanDuel and its daily fantasy football gaming products.

56.     Nevertheless, Defendant FanDuel knowingly exploits Plaintiff Garçon's and these players' valuable publicity rights for its own financial gain through its all-inclusive advertising campaign and various daily fantasy sports products.

57.     And Defendant FanDuel has been extremely successful in doing so.  Since its inception, these wide-ranging promotional efforts have driven users to Defendant FanDuel's daily fantasy sports product in droves.

58.     For example, according to SuperLobby.com, Defendant FanDuel's $5 million guaranteed NFL contest—Defendant FanDuel's top NFL contest—received almost 231,000 entries for Week 5 of the NFL season.  Across all of its guaranteed prize pool contests in Week 5 of the NFL season, Defendant FanDuel received almost 3.38 million entries.  Defendant FanDuel collected $20.6 million in entry fees for its NFL guaranteed prize pool contests and paid out nearly $17.1 million for Week 5 of the NFL season.

59.     According to SuperLobby.com, Defendant FanDuel is likely to meet—if not exceed—these huge numbers as the 2015 NFL season continues, especially considering the huge amounts FanDuel spends on advertising.

60.     Indeed, Defendant FanDuel generated almost $57 million in revenue in 2014 alone and awarded over half a billion dollars in cash prizes.  This year, Defendant FanDuel should beat last year's revenue, given its projection that it will hand out nearly $2 billion in cash prizes.

61.     Defendant FanDuel owes its success operating these daily fantasy football contests to NFL players, like Plaintiff and Class members, whose names and likenesses make FanDuel's games possible.  For without them and their on-the-field success, daily fantasy football would not exist.

62.     As a result of Defendant FanDuel's knowing misappropriation of their publicity rights, Plaintiff and Class members have suffered damages.

## CLASS ACTION ALLEGATIONS

63.     Plaintiff sues on his own behalf and on behalf of a class of persons under Rule 23 of the Federal Rules of Civil Procedure.  Subject to modification after discovery and case development, the putative Class is tentatively defined as:

> All National Football League (NFL) players on an NFL team roster since 2013 whose names and/or likenesses Defendant FanDuel used to operate or promote its fantasy sports products from January 1, 2013 through the present.

64.     Excluded from the Class are Defendants, their employees, co-conspirators, officers, directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries or affiliated companies, class counsel and their employees, and the judicial officers and associated court staff assigned to this case.

65.     Members of the proposed Class are so numerous that individual joinder of all members is impracticable in this case.  There are hundreds of Class members.

66.     Class members are identifiable by examining the rosters of the 32 NFL teams and by reviewing Defendant's records to determine which of those players Defendant used in its television and online advertisements and in the operation of its daily fantasy sports gaming products.

67.     Questions of law and fact common to the Class members predominate over questions affecting only individual members, including:

a.      Whether Defendant uses current NFL players' names and/or likenesses in its television and online advertisements;

b.      Whether Defendant uses current NFL players' names and/or likenesses in its daily fantasy sports gaming products;

c.      Whether such use is unlawful;

d.      Whether Defendant's conduct violates various rights protecting publicity rights;

e.      Whether Defendant's conduct violates 15 U.S.C. § 1125;

f.      Whether Plaintiff and Class members have been damaged by Defendant's conduct and the amount of such damage;

g.      Whether Defendant should disgorge its unlawful profits and the amount of such profits;

h.      Whether such use causes confusion; and

i.      Whether FanDuel intended to misappropriate players' rights.

68.     Plaintiff's claims are typical of the Class claims, as they arise out of the same course of conduct and the same legal theories.  Plaintiff challenges Defendant's practices and conduct as to the Class as a whole.

69.     Plaintiff is an adequate representative of the Class because his interests do not conflict with Class members' interests, he will fairly and adequately protect Class members' interests, and he is represented by counsel skilled and experienced in class actions.

70.     A class action is the superior method for fair and efficient adjudication of this controversy because no individual Class member can justify the commitment of the large financial resources necessary to prosecute this lawsuit against Defendant.  Separate actions by individual members would risk inconsistent or varying judgments, which would establish incompatible standards of conduct for Defendant and impair or impede Class members' ability to pursue their claims to resolution.

71.     Defendant has acted on grounds generally applicable to the Class, making final injunctive relief and corresponding declaratory relief with respect to the Class as a whole appropriate.

### COUNT I – Deprivation of Publicity Rights

72.     Plaintiff incorporates the allegations set forth above in paragraphs 1 through 71.

73.     Plaintiff's and Class members' names and likenesses hold significant commercial value.

74.     Defendant FanDuel has exploited Plaintiff's and Class members' names and likenesses without their consent for the purpose of advertising and operating its daily fantasy football gaming products.

75.      Defendant FanDuel has willfully and intentionally used Plaintiff's and Class members' rights of publicity.

76.     As a result of Defendant FanDuel's conduct, Plaintiff and Class members have been injured.

## COUNT II – False Endorsement, Violation of § 43 of the Lanham Act, 15 U.S.C. § 1125

77.     Plaintiff incorporates the allegations set forth above in paragraphs 1 through 76.

78.     Plaintiff's name and likeness hold significant commercial value.

79.     Defendant FanDuel has exploited Plaintiff's name and likeness without his consent to promote its daily fantasy football gaming product, to solicit users to its website, and ultimately to collect entry fees.

80.      Given his popularity and performance on the field, Plaintiff's name and likeness are highly recognizable to potential consumers who are deciding whether to establish a FanDuel account and to utilize one of its daily fantasy football products.  For that reason, FanDuel selects NFL players, like Plaintiff, to feature prominently in its advertisements when describing its daily fantasy football products.

81.     Defendant FanDuel's use of Plaintiff's name and likeness is likely to confuse potential FanDuel consumers about any connection or association between Plaintiff and Defendant FanDuel or as to Plaintiff's sponsorship or approval of Defendant FanDuel and its daily fantasy football gaming products.

82.     As a result of Defendant FanDuel's conduct, Plaintiff has been injured.

## COUNT III – Unjust Enrichment

83.     Plaintiff incorporates the allegations set forth above in paragraphs 1 through 82.

84.     Defendant FanDuel has been unjustly enriched as a result of unlawfully misappropriating Plaintiff's and Class members' rights of publicity, to their detriment.

85.     Defendant should not be permitted to retain the benefits it has received from its unlawful misappropriation.

86.     Plaintiff and Class members seek full restitution of Defendants' unlawful profits, which they acquired as a result of the unlawful conduct alleged in this Complaint.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests relief from this Court as follows:

a.     An award of damages for Defendant's violations of 15 U.S.C. § 1125;

b.     Certification of the action as a Class Action under Rule 23 of the Federal Rules of Civil Procedure, appointment of Plaintiff as Class Representative, and appointment of counsel of record as Class Counsel;

c.     An award of damages for Defendant's violations of Plaintiff's and the Class members' rights of publicity;

d.     An award of exemplary damages for Defendant's knowing violations of Class members' rights of publicity;

e.     An award for disgorgement of all profits earned by Defendant from promoting its daily fantasy sports contests using Plaintiff's and Class members' names and/or likenesses;

f.     An injunction enjoining Defendant from the future use of Plaintiff's and Class members' names and likenesses to promote its daily fantasy sports contests;

g.     An award for Plaintiff's costs and fees in bringing this action; and

h.     Any other relief as the Court may deem just and proper.

**<u>JURY DEMAND</u>**

Plaintiff demands a jury trial on all issues triable by jury.

Respectfully submitted,

/s/ Thanos Basdekis
Brian A. Glasser
Thanos Basdekis (283712)
BAILEY & GLASSER LLP
1054 31st Street, Suite 230
Washington, DC  20007
Telephone:  (202) 463-2101
Facsimile:  (202) 463-2103
E-mail:   bglasser@baileyglasser.com
               tbasdekis@baileyglasser.com

*Pro hac vice* applications to be filed:

Joseph F. Murray
Brian K. Murphy
Geoffrey J. Moul
Murray Murphy Moul + Basil LLP
1114 Dublin Road
Columbus, OH  43215
Telephone:  (614) 488-0400
Facsimile:  (614) 488-0401
E-mail:  murray@mmmb.com
             murphy@mmmb.com
             moul@mmmb.com

Counsel for Plaintiff